IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 4, 2025

**IN RE KEIGAN S., ET AL.**

**Appeal from the Juvenile Court for Williamson County**
**No. 38523-2024-JT-3       Sharon Guffee, Judge**
_____

**No. M2024-01847-COA-R3-PT**
_____

This appeal involves a petition to terminate the parental rights of a mother to two of her three children. The juvenile court found that three grounds for termination were proven and that termination was in the best interests of the children. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and JEFFREY USMAN, JJ., joined.

Greg Dawson, Nashville, Tennessee, for the appellant, Leah S.

Jonathan Skrmetti, Attorney General and Reporter, and Allen T. Martin, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION[1]**

## I.     FACTS & PROCEDURAL HISTORY

This appeal involves the termination of the parental rights of Leah S. ("Mother") to two of her three children. The children at issue, Keigan S. and Kamden S., were born in 2013 and 2016. On October 24, 2019, the Tennessee Department of Children's Services ("DCS") received a referral identifying Keigan, Kamden, and Mother's third child, a daughter, as victims of drug exposure.[2] The referral also alleged that Mother physically and psychologically abused her daughter. The referral stated that there were concerns of

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' last names to protect their identities.

[2] Mother's rights to her daughter are not at issue in these proceedings.

drug abuse in the home perpetrated by Mother, Keigan and Kamden's father ("Father"), and a friend of Mother's named Benji.[3] DCS filed a dependency and neglect petition against Mother and Father on November 12, 2019. The petition stated that Mother had submitted to a drug screen and tested positive for THC, cocaine, benzodiazepines, and methamphetamine. Keigan and Kamden were removed from Mother and Father's custody and placed with their paternal grandmother ("Grandmother"). Their sister was placed with her paternal grandparents. On January 22, 2020, the parties stipulated that the children were dependent and neglected as to Mother and Father due to drug exposure. A non-custodial permanency plan was adopted stating that Mother was to: (1) abstain from drug use, (2) submit to random drug screens, (3) attend outpatient rehab, (4) ensure her home was free of environmental hazards, (5) attend supervised visitation, and (6) provide employment verification. Subsequently, Mother began submitting to regular drug screens. She passed all drug screens, participated in an intensive outpatient program ("IOP"), attended individual counseling sessions, participated in supervised visits with Keigan and Kamden, and maintained employment.

Unfortunately, DCS received another referral on March 31, 2020, which alleged that Grandmother had hit Keigan while under the influence of alcohol. The referral also alleged that Grandmother had endangered the children by leaving the stove on while intoxicated, struggled to control Keigan, and struggled to care for the children physically and financially. As a result, DCS filed a petition for dependency and neglect against Grandmother on April 1, 2020. This petition stated that Grandmother was no longer an appropriate placement and requested the children be placed in DCS custody. The juvenile court determined that the children were dependent and neglected as to Grandmother and entered an order bringing them into its protective jurisdiction. As a result, the non-custodial case was closed as to Keigan and Kamden, and they were taken into DCS custody. The children, ages six and three, were then placed in a foster home in Pulaski, Tennessee.

Meanwhile, Mother continued to comply with the responsibilities assigned to her in the non-custodial permanency plan. She completed an IOP, participated in DCS-offered services, and continued to test negative for drugs. Mother's child support obligations were set at $400 per month. A new permanency plan was ratified on August 28, 2020. The plan noted that a court appointed special advocate ("CASA") would participate in the proceedings and Youth Villages would provide services to the children. Many of Mother's responsibilities overlapped with those listed in the non-custodial plan. These responsibilities are summarized as follows: (1) maintain appropriate housing, (2) provide proof of legal and stable income, (3) abstain from drug use and report any newly prescribed medications, (4) participate in visitation with the children, (5) attend all of the children's medical appointments, and (6) participate in counseling with a domestic violence component. After this plan was ratified, Mother continued to participate in counseling and

---

[3] Father is not the father of Mother's daughter. Her father was also named in the dependency and neglect petition, but his whereabouts were unknown.

continued to test negative for drugs. Mother was also participating in "additional visitation supervised by family members." As a result, the juvenile court determined that it would be in the children's best interests to begin "an extended weekend pass and then a trial home pass with Mother." The weekend visit took place, and the children proceeded to the 90-day trial home visit, which began on December 7, 2020. The visit proceeded without issue for some time. The DCS workers reported that "all [was] going well" and there were "no concerns about Mother's sobriety."

However, DCS filed a motion for emergency judicial review on February 1, 2021. Family members provided information that indicated Keigan and Kamden were at an "imminent risk of harm in Mother's care." A hearing was held on the matter, and the juvenile court stated that it was "not going to disrupt the trial home pass with the boys[.]" However, the juvenile court noted its concerns given the nature of the allegations and the reports of "escalated behavior in the mother's home [that was] incredibly damaging to the children." As a result, the juvenile court ordered that there was "to be no cursing, no slapping, no yelling, and no spanking of these children at all." Nevertheless, DCS soon filed another motion seeking an "emergency ex parte order suspending [the] trial home placement." DCS had received additional referrals alleging physical abuse by Mother based on certain disclosures made by Keigan at his school. Additionally, Mother had submitted to a drug screen on February 20, 2021, and tested positive for methamphetamine, amphetamines, and THC. The juvenile court entered an order revoking the trial home visit on April 21, 2021. A new permanency plan was ratified the same day and listed many of the same responsibilities listed in the first plan. However, this plan added responsibilities requiring that Mother abstain from alcohol use, prevent the use of any corporal punishment by herself or any others approved to supervise the children, and complete a psychological evaluation through an approved service provider. Meanwhile, the children were placed in a foster home.

A permanency hearing order was entered on April 30, 2021. The juvenile court found that Mother was in substantial compliance with the permanency plan but was not "consistently applying what she ha[d] learned from providers in parenting the boys." Subsequently, Mother passed a hair follicle drug test taken June 28, 2021, completed an alcohol and drug assessment, completed a psychological evaluation, participated in therapy, and participated in regular supervised visitation with the children. As a result, DCS filed a motion requesting that Mother resume unsupervised visitation on June 23, 2021. The motion also noted that Keigan was at risk of disrupting his foster placement. Much of this was attributed "to him wanting to spend more time with Mother." This motion was granted by order entered August 27, 2021.

Mother again began to participate in visitation and there were no reported issues. DCS then filed a motion to begin a new trial home visit, which was granted as to Keigan only in an order entered October 12, 2021. However, the visit lasted only a short time. Mother submitted to a drug screen on October 25, 2021, and again tested positive for

amphetamines, methamphetamine, and THC. Additionally, DCS received a referral alleging that Mother scratched Keigan on his back with a fork. Subsequently, DCS filed a motion to suspend the trial home placement that was granted by order entered November 10, 2021. Keigan was placed in a temporary foster home in Montogomery County. However, this placement was disrupted when Keigan engaged in an act of aggression and injured the foster parent. Keigan was then placed at Inner Harbour, a Youth Villages facility located in Douglasville, Georgia. He remained there for some time but was eventually moved to Laurel Heights, a facility located in Atlanta, Georgia. Kamden appears to have never been brought to the second trial home visit and remained in his foster placement. He was later moved to a permanent foster home in Murfreesboro, Tennessee.

Mother tested positive for drugs approximately eight times between December 2021, and the permanency hearing that took place in April 2022. Despite this, the juvenile court again found that Mother was in substantial compliance with the permanency plan. However, the juvenile court did note that Mother's drug use and the behaviors of the children were "barriers to another [trial home visit] at [that] time." Shortly thereafter, Mother tested positive for drugs five more times. A new permanency plan was ratified on September 6, 2022, which noted these positive tests and stated that Mother was not using mental health services, was not taking any mental health medication, and was not attending sobriety meetings. The permanency plan provided the same responsibilities as the previous plans. A judicial review order entered November 18, 2022, noted that Mother tested negative for drugs during the "[f]irst week of November." It is unclear what occurred in the interim, but Mother again tested positive for amphetamines and methamphetamine on March 30, 2023.

Subsequently, DCS filed two petitions for contempt against Mother for failure to comply with an order of child support. In response, Mother filed a petition seeking a modification of her support obligations, which was granted by order entered August 23, 2023. It appears that Mother was struggling financially at this time. Mother's financial issues had resulted in her being forced to move out of her apartment. Since that time, Mother has stayed with friends, family members, in hotel rooms, or in her car. Her obligations to Keigan and Kamden were reduced from $400 per month to $150 per month. All arrearages were waived.

Nevertheless, Mother tested positive for drugs several more times prior to the end of 2023. During this period, Mother also tested positive for alcohol for the first time. She tested positive for fentanyl for the first and only time on December 12, 2023. As a result, the guardian ad litem filed a motion to suspend Mother's visitation on December 15, 2023. Mother filed a response in which she denied having used drugs. She alleged that the testing methods used by DCS were subject to human error and claimed she had "video of the procedure used by DCS to 'interpret' the test results," which "show[ed] the DCS employee having trouble reading the results and having to ask for help." She also submitted a screen capture taken from her phone displaying the results of a drug screen taken on December

18, 2023, which listed negative results. Mother never provided the referenced video evidence. Nevertheless, the juvenile court denied the motion to suspend visitation. However, the order stated that visitation would return to supervised status until such time that Mother could provide a clean nail bed drug screen.

On March 26, 2024, a new permanency plan was ratified. At this point, the juvenile court found for the first time that Mother was not in substantial compliance with the permanency plan. The order noted that Mother had continued to use drugs and alcohol, had failed to progress to unsupervised visitation, and lacked stable housing. The plan itself contained many of the same responsibilities listed in the previous plans, including to abstain from drugs and alcohol, to maintain stable housing, and to submit proof of employment.

On May 21, 2024, DCS filed a petition to terminate the parental rights of both Mother and Father. The petition listed the following grounds against Mother: (1) substantial noncompliance with a permanency plan, (2) persistent conditions, and (3) failure to manifest an ability and willingness to assume custody. The petition also averred that termination would be in the best interests of both children. Mother tested negative for all substances except nicotine on her next drug screen. However, she tested positive for cocaine on the following screen. She tested positive for alcohol on the next. Keigan remained at Laurel Heights but had "meet and greets" for new placements scheduled, and Kamden remained at his foster home placement in Murfreesboro. At some point in July 2024, Father surrendered his parental rights to the children. Mother proceeded to trial on September 23, 2024. By that time, the children were ages ten and eight.

Ms. Deja Shaw was the first witness called to testify. Ms. Shaw is a social services team leader and was the case manager assigned to this case for two years. She later became the case supervisor and still served in that role at the time of trial. Ms. Shaw discussed the history of the case and testified that Mother had submitted to regular drug screens. Ms. Shaw was asked to explain the testing methods that Mother submitted to throughout the proceedings. She stated that Mother took "a mixture" of tests including oral screens, urine screens, hair-follicle tests, and nail-bed tests. Ms. Shaw stated that she personally administered urine screens to Mother. She explained that she would provide Mother a cup, Mother would provide a sample, and they would then "wait for the results to come." At that point, she would complete a drug screen form, marking any positive results. Mother would sign a form preserving the results of the test, which would then be submitted. She also explained the process of administering an oral drug screen. This was done using "mouth swab[s]." The swabs came in sealed packets that Ms. Shaw would open. She would then pass the swab to Mother. Mother would place the swab in her mouth. Ms. Shaw would then wait for the swab to turn blue, at which point, she placed the swab into a provided "solution." She would then "close that solution up, wrap it up, [and] send it off to Labcorp[,]" the lab responsible for analyzing results of tests conducted by DCS. She stated that she wore gloves while administering screens and would monitor Mother as she

took the test.

Ms. Shaw reviewed a litany of positive drug screens taken by Mother throughout the proceedings. She noted that, despite her drug use, Mother was deemed to have been in substantial compliance with the permanency plans ratified in 2021, 2022, and 2023. She explained that while Mother continued to fail drug tests, she was complying with other responsibilities listed on the plans. Ms. Shaw noted that Mother began testing positive for alcohol in November 2023. She explained that this was a significant development as her permanency plans required her to abstain from alcohol use. Mother failed additional drug screens and tested positive for methamphetamines and fentanyl on December 12, 2023. Ms. Shaw also noted that, around this time, Mother began to allege "that [DCS's] drug screens were faulty." To alleviate these concerns, Mother began submitting to screens performed by the Williamson County Juvenile Detention Center and by a company called Resolve Diagnostics in addition to those performed by DCS. Despite this, Mother tested positive for drugs and/or alcohol several more times prior to trial. She stated that a total of eight permanency plans had been developed throughout the life of the case. Each of these plans instructed Mother to refrain from drug and alcohol use. The plans also provided different steps for Mother to take in order to achieve sobriety. She stated that the juvenile court finally found Mother to be in substantial noncompliance with the permanency plan in March 2024 due to drug use and her lack of a stable living situation.

Ms. Shaw also stated that she believed Mother remained in substantial noncompliance with the permanency plan. She explained that Mother did not have "her own legal residence" and, to her knowledge, was not making any attempts to obtain a residence. She testified that DCS had provided Mother with "resources of places where she could potentially go to have a house" but Mother had not taken any steps toward obtaining a stable residence. Ms. Shaw also stated that Mother had failed to progress to unsupervised visitation with the children. Additionally, no recent change had occurred indicating that a new trial home visit would become appropriate in the near future. She expressed her opinion that the permanency plans were reasonable and would have resulted in the children returning to Mother's custody if she had complied with them. She also stated that the children could not be placed with Mother due to her drug addiction and housing instability. She noted that there was little chance those conditions would be remedied in the near future.

Ms. Shaw was also asked about the relationship between Mother and the children. She stated that a continuation of the relationship would diminish their chances of being placed in safe, stable, and permanent homes. She also stated that Kamden had been placed in a pre-adoptive home for two years. The foster parents were considering adoption but "wanted to kind of see the progress of Kamden without [Mother] in the picture." She explained that Keigan had been placed in a new foster home the preceding Thursday but there was no indication as to whether the foster parents would adopt him as it "was a little early to ask that question." Keigan becomes very excited when Mother comes to visit him

because he "loves his Mom." Ms. Shaw stated that he typically does well with visitation but did "struggle" at times. However, she opined that Keigan needed stability and continuity Mother was not able to provide. She also expressed her opinion that removing Kamden from his present foster situation would cause harm as he had been there for two years and was "doing well in that home." However, removing Keigan from his current placement would not cause the same issues because he had only recently been placed in his foster home.

Ms. Shaw also testified regarding Mother's visitation with the children. She stated that Mother had consistently visited the children, even when Keigan was placed in Georgia. Additionally, Mother had engaged in some DCS-provided services, but Ms. Shaw explained that she had not utilized them to their full extent. For example, Mother had not taken advantage of the housing resources provided. She also cited Mother's inability to achieve sobriety despite her participation in numerous drug and alcohol programs.

On cross-examination, Ms. Shaw was asked to explain the "hierarchy" of the various types of drug tests that Mother submitted to over the course of the proceedings. She was asked which test she would "prefer for the accurate results" between a urine test and a nail bed test. She explained that "both [are] going to be accurate" but a nail bed test would "date back six months from any date that . . . [Mother] goes and takes that service." Meanwhile, a hair follicle test would only date back three months. Ms. Shaw was later asked whether she was aware that Mother had taken prescription diet pills for a period of time. Ms. Shaw stated that she was aware of this. She explained that, at one point, Mother had tested positive for amphetamines and claimed the positive results had been caused by her use of diet pills. DCS requested that she stop taking the diet pills. Ms. Shaw stated that Mother's use of these pills was concerning because of her addiction history, which presented the question of whether she was "using [the pills] to take in place of not having those other illegal substances[.]" She also stated that Mother stopped using the pills when asked "[a]nd since then, we have had several amphetamine drug screens without her taking those diet pills." Mother took the pills from September 2020 until March 2021. However, Mother tested positive for amphetamines several times throughout 2022 and 2023.

Next, Ms. Shaw was asked about the children's educational requirements. She stated that both children had individualized education plans ("IEPs") in place and noted Mother was an active participant in the children's educational planning and school activities. She explained that, during the trial home visits, Mother was called by the school to help calm Keigan down when he was unable to control his emotions. Mother also attended doctors' appointments and wellness visits. Ms. Shaw was asked about some of the services Mother was offered throughout the proceedings. She stated that Mother had recently completed an IOP program and had done "two or three" previously.

Next, the guardian ad litem asked Ms. Shaw to discuss Mother's compliance with the permanency plans in more detail. Ms. Shaw noted that the juvenile court found Mother

- 7 -

to be in substantial compliance with permanency plans entered in 2021, 2022, and 2023 despite her having tested positive for drugs and alcohol a litany of times. However, during those periods, Mother was performing many of the other responsibilities listed in the plans. She underwent a drug and alcohol assessment, a psychological assessment, and a parenting assessment. She also submitted proof of employment regularly. Regardless, Ms. Shaw noted that it was not "typical" for an individual to be found to be in substantial compliance if there were important tasks listed on the plan left uncompleted. She stated that she did not recall why Mother was found to have been in substantial compliance despite these tasks not having been completed.

Ms. Shaw also discussed some of the children's medical issues. Both children have been diagnosed with a genetic disorder called pachygyria that causes developmental and cognitive delays. This condition places both children on the autism spectrum. At the time of trial Kamden was receiving in-home services through Youth Villages. He was doing some therapy and taking medication. Keigan required "ADA" therapy, individual therapy, medication, and in-home services. Both children exhibit poor behaviors when dealing with their issues. Kamden's bad behaviors include hitting, kicking, biting, self-harm, and regression in toileting. Keigan yells, screams, and physically harms others. He was removed from two foster homes due to acts of physical aggression. He had not demonstrated self-harm behaviors but had made suicidal comments the week preceding the trial. He had also experienced regression in toileting. His triggers included being told no, Mother leaving, or "things are not going his way."

Ms. Shaw voiced her concerns with Mother's ability to deal with the children's medical issues and treatment requirements. She noted that Mother had not dealt with the children full-time for several years. Ms. Shaw also stated that Mother had not explained how she intended to manage these behaviors. Mother had not informed DCS how she planned to take the children to all of their required appointments while maintaining the employment necessary to provide for them financially. She was not confident in Mother's ability to parent the children, based largely on her failure to remain sober during the trial visits in addition to the high needs of both boys. This concluded Ms. Shaw's testimony.

Next, Ms. Cheryl Sanders was called to testify. Ms. Sanders works in the CASA program. She was appointed in this case in 2019. She began her testimony by recounting her first meeting with the children, which occurred while the children were placed with Grandmother. Ms. Sanders stated that, when she arrived, the children were "running wild. I mean, out of control." Keigan threw a shoe at her shortly after she arrived. She remained in contact with the children throughout the case and explained that Keigan's behavior had gotten worse as he had gotten older. She stated that he has an IQ of 68 and "is very mentally, emotionally, [and] physically challenged." She stated that, "it's going to take a very special, strong . . . loving, concerned, constant person or place for him [ ] to make it because . . . he's hard to handle." She also explained that one foster home placement was disrupted, in large part, due to Mother's behavior. Those foster parents "did not get along

- 8 -

with" Mother and complained to Ms. Sanders. She explained that the complaints pertained to Mother "interfering or she wouldn't show up when she was supposed to, or she was late, or she had lied to them." After Mother began to test positive for drugs, "they just disrupted. . . . They just had had enough[,] and they just told me they couldn't work with her."

Ms. Sanders identified the time when Mother lost her apartment as a "very pivotal event" in this case. It appears that Mother's rent increased substantially, and she was forced to move out of her apartment in August 2022. Ms. Sanders stated that her team "searched around" and they "were eager" to help Mother find a new home. However, Mother instead moved in with her friend Benji. This was the same Benji listed as a perpetrator of drug abuse in the petition for dependency and neglect filed at the outset of this case. Mother claimed that she was not romantically involved with Benji and only moved in with him to save money. She was working at UPS at the time. However, Ms. Sanders stated that Mother failed to save any money during this period, and she continued to test positive for drugs. She stated that after Mother lost the apartment she never again trended in the right direction. Despite Mother attending doctors' appointments, participating in school activities, and attending visitation, "she just couldn't get over [the drug use] hurdle. And I didn't see any improvement."

Ms. Sanders also explained that this regression had a prominent effect on the children. For example, Kamden would become very anxious when anticipating a visit from Mother and he would be extremely happy when she came. However, when Mother left, Kamden would "take ten steps back." He would become violent and throw things. Ms. Sanders explained that "the anticipation of her coming just wrecked his week. And it took him days to calm [ ] down." She later stated that "[h]e misses her. He looks forward to seeing her. When she doesn't appear, he's distraught. When she leaves him after a visit, he's distraught." She explained that the case had been proceeding for four and one-half years, and as Kamden gets older, "it's more painful for him." She stated that she did not believe Mother was in a position to receive increased visitation or obtain custody of the children. She later explained that she did not believe that Mother could parent Keigan given his various diagnoses and needs. Ms. Sanders stated that Mother had "pretty much proven that she can't." She pointed to the failed drug screens, the lack of permanent residence, and lack of stable employment as "too much [weighing] against her."

On cross-examination, Ms. Sanders was asked "what benefit" would derive from the termination of Mother's parental rights to Kamden if he loved her as she said he did. Ms. Sanders explained that she believed the children needed "permanency." She stated that Kamden needed to know he would move on and "have a new family." Ms. Sanders also recounted an incident in which she had made an arrangement with "Healing Hearts," a program designed to help women struggling with drug addiction. She stated that this program would have provided Mother with a place to live rent free while she worked to save money and regain custody of the children. However, Mother did not enroll and subsequently stopped communicating with Ms. Sanders.

Mother was the final witness called to testify. Mother was asked whether she fully agreed with the results of the drug tests submitted as evidence. She stated that she did not. She explained she did not agree with "the drug tests that were administered by the Department, [because] they d[id] not obtain a certified [medical resource officer]." She stated that a medical resource officer ("MRO") would have been able to "certify this information to be attested as the confirmation of a drug screen." Mother then proceeded to review each of the drug screens entered as evidence to clarify those she disputed and explain why she disputed them. She first reviewed the results of the drug screen entered into evidence as Exhibit 4. This exhibit contained the results of a drug screen taken in November 2021, which showed positive results for amphetamines, methamphetamine, and THC. However, Mother claimed that she disagreed with these results because she was using diet pills at the time it was administered. Mother also stated that she was disputing "all of these done by Labcorp," which referred to nine positive drug screens submitted as Exhibit 5. She disputed these results because an MRO had not signed them. Next, Mother discussed Exhibit 6, which contained a drug and alcohol screen she had taken on November 7, 2023. The screen demonstrated positive results for alcohol and THC. Mother stated that she did not dispute the results of this screen. However, she claimed she had provided documentation to DCS demonstrating that she had been prescribed medication for a kidney infection. She claimed that the infection caused certain bacteria in her kidney to ferment, and this triggered a false positive for alcohol. This documentation is not contained in the record. She also stated that she did not challenge the results contained in Exhibit 7, which contained a drug screen taken November 16, 2023, and demonstrated positive results for THC. She acknowledged that this report was certified by an MRO. However, she denied having used THC. She stated that it was "perfectly fine for [the report] [to be] used as an exhibit since I am challenging all the Labcorp done by the Department of Children's Services." She claimed to have been passing her drug screens at the time those tests were administered and to have never tested positive for methamphetamine. Next, she reviewed the drug screen submitted as Exhibit 8. Mother noted that this exhibit contained the results of the screen taken December 12, 2023. She denied the results of this screen based on her claim that she possessed video of a DCS employee struggling to read the results, and her submission of a screen capture taken from her phone displaying negative drug screen results from a test taken at around the same time. This video is not contained in the record. She next denied the results of the drug screen submitted as Exhibit 9. This exhibit contained the results of a screen taken February 9, 2024, that demonstrated positive results for alcohol and THC. When asked why she disputed the results of this screen, she responded, "[b]ecause I was not on these substances during that time."

Initially, Mother did not dispute the drug screen results submitted as Exhibit 10. This exhibit contained the results of several screens taken throughout 2024. These screens demonstrated several positive results for drugs and/or alcohol. She stated, "[t]hose are okay. They've got a certified MRO on them." The juvenile court asked Mother to clarify her position because the results of Exhibit 10 contradicted her claim she had not used

alcohol. Mother responded, "[n]o. I have not used alcohol." The juvenile court again sought clarification, asking, "[s]o you're denying the results, but you're saying the drug screens are okay?" Mother responded, "I wanted to verify that there was a certified MRO because there are not some in the discrepancy because of the way that these drug tests have been administered." After a good deal of back and forth, Mother again denied having used alcohol or drugs and stated, "[t]hat was the very first drug screen I took for [Resolve Diagnostics]. So[,] their machine could very much be inaccurate." She also questioned why the results contained two patient identification numbers but did not expand on any possible ramifications. Mother was next asked about two of the individual drug screens contained in Exhibit 10 that demonstrated positive results for alcohol. Mother stated that "ethyl sulfate can [ ] be ripened bananas - - found in banana nut bread or processed foods."[4] Mother was asked to clarify whether she was denying alcohol use and responded, "I am telling you that I have abstained from alcohol use." Mother was finally asked "[s]o all these drug screens are wrong?" She responded "[y]es" but did acknowledge that she engaged in vaping. Mother further supported her claim by relating a story about her father who resided with her in 2022. Mother claimed that her father participated in a drug screen and passed despite taking "prescribed opiates" at the time.

Mother was next asked to discuss her residential history. She stated that she lived at an apartment in Antioch, Tennessee, from March 2020 to December 2022. At this point her rent increased substantially and she was forced to move out. She then moved in with Benji at a home located in Brentwood, Tennessee. She stated that she lived there until September 2023 but did not explain why she left. She then lived with her mother "off and on" at her mother's apartment in Antioch. She later clarified that she did not reside at that apartment full-time as her mother would only permit her to "sleep there a couple of days here and a couple of days there." She stayed with a friend named Joseph when she did not stay with her mother. She stated that her mother moved to Smyrna, Tennessee, in May 2024. She subsequently moved in with her uncle and cousin in Lawrenceburg, Tennessee. She later explained that she stays in Lawrenceburg "predominantly" but agreed that she was essentially "couch surfing." She stated that she would often sleep in her car or in a hotel room in order to be closer to her work. She agreed that she did not have a residence and had not had consistent full-time employment for a long period of time. She later stated that DCS recommended help finding housing, and she received a "flyer" with information via text message. She claimed that she did not do anything with the information at the time due to wage garnishments. She later applied for low-income housing "[t]hrough Metro Nashville" and "over in La Vergne." She was asked whether she had received any information regarding housing in Maury County and stated that she had not sought housing there because it was too far from her job. She stated that she intended to move closer to Nashville, preferably Rutherford County, because that is where both children attend school. She had not applied for housing in Rutherford County but had looked online.

---

[4] Ethyl sulfate is a biomarker used to detect alcohol use.

Mother also testified regarding the children's various medical diagnoses. She stated that both children had required corrective eye surgery early in life due to low muscle tone caused by their pachygyria diagnoses. Keigan had this surgery twice, once in 2015 and a second time in 2021. Kamden had this surgery in 2018. She claimed that they required yearly appointments at Vanderbilt Hospital and special glasses intended to strengthen their eye muscles. Mother claimed that the children had not attended any of these appointments while in DCS custody. She stated that the children also had neurological issues and were required to attend specialists. She explained that pachygyria is an "autosomal recessive trait, [a] rare brain disorder that was caused by the RELN gene that's in your TUBA." It places both children on the autism spectrum. Kamden had also been diagnosed with "frontal lobe malformation." She stated that she had therapy in place through TEIS when the children were young, but they aged out at three years old.

Mother also discussed her relationships with the children. She stated that they were "normal mom-and-child relationship[s]" and that she loved her children "and would do anything for them." She maintained that she had been active in their lives, their education, and attended all doctors' appointments. She also stated that she completed four IOP programs and had taken two parenting classes. Mother was then asked about her financial ability to care for the children. She admitted that she had been unable to save money despite not paying housing costs for some time. She cited car repairs, monthly car payments, and storage payments as obstacles preventing her from saving. Mother was then asked how she intended to provide for the boys if they were returned to her custody. She responded, "[w]ell, my child support would stop whenever they come home." She stated that she was working two jobs at the time of trial, one at UPS and the other at a restaurant. She maintained that she "would potentially" go full-time at UPS and had "looked into driving for them." She later explained that she worked approximately 20-30 hours per week at UPS and 20-25 hours per week at the restaurant. She stated that she earned between $500 and $600 per week. She had not provided DCS with proof of income since she started her job. This concluded the first day of the trial.

Shortly after the first day of trial, Keigan was removed from his foster placement and placed at Vanderbilt Hospital due to "escalations" and "aggressive behavior." Keigan spent September 10th through 13th at Vanderbilt Hospital. He then returned to his foster placement but was sent back to Vanderbilt the following day. Keigan was placed at Saint Thomas-Rutherford Hospital in Murfreesboro until September 18. Keigan was then transferred to Summit Hospital until October 2nd. At that point, he returned to the Laurel Heights facility in Atlanta, Georgia. Keigan remained there until October 14, at which point, he was placed in a foster home in Mt. Juliet, Tennessee. Shortly thereafter, he was transferred to another foster home in Antioch, Tennessee. The second day of trial took place on October 29, 2024.

On cross-examination, Mother acknowledged that the children were originally taken into DCS custody because she tested positive for drugs. She stated that the case had been

going on for five years as of October 28, 2024, and claimed she had not used any illegal substances during that period of time. She did acknowledge that she had used alcohol during that time, but claimed, "that was addressed back in 2021." She again maintained that the results of any drug screens which "ha[d] no certified MRO" were incorrect. Mother was then asked about a drug and alcohol screen that she had taken shortly after the first day of trial. This screen showed a positive result for alcohol. Mother again claimed that the results were incorrect and insisted she had not used alcohol.

Mother was again asked how she planned to provide for the children when considering all of their medical needs, therapies, educational needs, and doctors' appointments. Mother claimed that she would do so "[t]he same way [she] did whenever [she] first got started." She was asked why her parental rights should not be terminated. She responded, "[b]ecause I'm the only one who can actually advocate and care for my children." She also claimed that she would be prepared to do so soon. She stated that she had recently reached out to the Franklin Housing Authority to obtain low-income housing. She hoped to have a residence that would permit her to care for her children in the near future. She stated that she had requested her child support obligations "be reduced, if not temporarily stopped, in order for [her] to be able to afford a place." Mother was asked whether she understood that, if her children were returned to her custody, she would then be responsible for paying the costs of their care directly rather than in the form of child support. Mother stated she was aware of that, but she claimed her "support [was] at an increased base where they [were] taking approximately up to 50 percent of [her] disposable income each paycheck on a weekly basis." This concluded Mother's testimony.

The juvenile court entered its final order on November 19, 2024. Importantly, the juvenile court addressed Mother's claims that her positive drug screens were false or inaccurate. The juvenile court stated Mother's testimony that she had not engaged in drug or alcohol use was "impossible . . . to accept as credible testimony." Subsequently, the juvenile court determined that DCS had proven three grounds for the termination of Mother's parental rights: (1) substantial noncompliance with a permanency plan, (2) persistent conditions, and (3) failure to manifest an ability or willingness to assume custody or financial responsibility for the children. The juvenile court also determined that the termination of Mother's parental rights was in the best interests of the children. Mother filed this appeal on December 12, 2024.

## II.    Issues Presented

Mother presents the following issues for review on appeal, which we have slightly reframed:

1. Whether the juvenile court erred when it determined grounds for termination existed.
2. Whether the juvenile court erred when it determined that termination was in the best

interests of the children.

For the following reasons, we affirm the termination of parental rights.[5]

### III.    STANDARDS APPLICABLE TO TERMINATION CASES

"'A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016)). "Parental rights have been described as 'far more precious than any property right.'" *Id.* (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the child's best interest pursuant to the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Valentine*, 79 S.W.3d

---

[5] Mother only submitted "[w]hether the court applied the Best Interest of The Child test correctly to the children in question" as her issue on appeal. In the body of her brief, Mother addresses only the ground of failure to assume custody or financial responsibility and the best interest factors. Likewise, counsel argued at trial that Mother's rights should not have been terminated based on the best interests of the children. When asked by the juvenile court to clarify that the argument pertained only to the best interest factors and not grounds, counsel responded, "[y]es, Your Honor." While these actions would typically result in the waiver of several issues, we will nonetheless review the juvenile court's findings as to each ground for termination pursuant to our Supreme Court's directive in *In re Carrington H.* *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.")

539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

We review a court's factual findings *de novo* in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 523-24. However, "[w]hen a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary." *In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023). We make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review *de novo* with no presumption of correctness" as are any additional questions of law. *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination

#### 1. *Substantial Noncompliance with a Permanency Plan*

The juvenile court determined that DCS proved the ground of substantial noncompliance with a permanency plan by clear and convincing evidence. "Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *7 (Tenn. Ct. App. July 13, 2015) (citing Tenn. Code Ann. § 37-2-403(a)(2)(A)). "A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that '[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(2)). To establish this ground, the parent's noncompliance with the plan must be substantial, and the plan's requirements must be "reasonable and [ ] related to remedying the conditions that necessitate[d] foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). *See In re Valentine*, 79 S.W.3d at 547. "In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and 'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537 (citing

- 15 -

*In re Valentine*, 79 S.W.3d at 547). However, "[t]rivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). "Substantial noncompliance is a question of law which we review *de novo* with no presumption of correctness." *In re Valentine*, 79 S.W.3d at 548.

A total of seven permanency plans were ratified throughout this case. We have summarized the responsibilities assigned to Mother as follows:

A. Obtain and maintain appropriate housing for the family and maintain safe conditions.
B. Provide proof of legal and stable income on a monthly basis.
C. Maintain contact with the DCS.
D. Permit DCS to conduct random safety sweeps of the home for any alcohol.
E. Abstain from using any illicit drugs, nonprescribed medications, and alcohol.
F. Submit to drug and alcohol screenings when requested. Complete an IOP and comply with any recommendations. Report the use of any newly prescribed medications.
G. Participate in supervised visitation with the children and maintain appropriate contact with Youth Villages and the assigned workers.
H. Attend all medical appointments with supervision.
I. Refrain from employing any corporal punishment and ensure corporal punishment is not employed by any others permitted to supervise the children.
J. Complete a psychological evaluation through an approved service provider and follow any recommendations.
K. Participate in counseling with a domestic violence component and follow any recommendations made by the provider. Demonstrate an ability to protect the children from witnessing or experiencing domestic violence.
L. Refrain from incurring any criminal charges and report any arrests to DCS within 48 hours.

These responsibilities are reasonable, and they relate to remedying the conditions that existed when the children entered DCS custody. Most of these responsibilities were included as part of the first permanency plan ratified on June 9, 2020, and the rest were included in the second permanency plan entered April 22, 2021. From that point forward, the responsibilities remained consistent. Perhaps the most important responsibilities were those requiring Mother to abstain from drug and alcohol use, as drug use was one of the primary factors that resulted in the children being taken into DCS custody. The juvenile court determined that Mother was in substantial noncompliance with the permanency plans due to her persisting drug and alcohol use. Accordingly, the juvenile court found this

ground for termination was proven by clear and convincing evidence. We agree.

Mother did successfully perform several of the responsibilities listed in the permanency plans. She appears to have maintained contact with DCS throughout the majority of the case. She also completed multiple IOPs. She attended many of the children's medical appointments, and at trial, was able to explain their various diagnoses and medical histories. Mother also maintained visitation as permitted.

However, Mother has not complied with the responsibilities of abstaining from drug and alcohol use. The children were initially brought into DCS custody due to Mother's drug use. Mother was granted two trial home visits during this case, and both visits were suspended due to Mother testing positive for methamphetamine, amphetamines, and THC. Since that time, Mother has consistently failed drug and alcohol screens. The evidence contained in the record indicates that Mother tested positive for drugs and/or alcohol more than 30 times over the course of these proceedings. We have previously determined that a parent's failure to engage in the efforts necessary to overcome their addiction to drugs constituted substantial noncompliance with the parent's permanency plan. *See In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). The same is true here, as Mother's continued drug and alcohol use has remained the primary barrier to reunification throughout this case and prevents her from effectively parenting her children.

Mother disputed the results of the drug and alcohol screens at trial and in her appellate brief. She claims that "the test results could have been inaccurate if not signed off by the appropriate supervisors that followed the test through the results phase." At trial, Mother claimed that false positives could have been caused by her use of diet pills, mistaken identity, a kidney infection, and consumption of overly ripe bananas and processed foods. She also maintained that the absence of an MRO rendered many of the screens unreliable. However, Mother has not provided any substantive evidence that a false positive or mistaken result occurred. For example, Mother claimed that her use of diet pills could have triggered a positive result for amphetamines. The testimony indicated that Mother only used diet pills between September 2020 and March 2021. However, she tested positive for amphetamines well after March 2021, in both 2022 and 2023. As to her claim of mistaken identity, Mother has not provided any evidence whatsoever casting doubt on the source of the positive samples, and Ms. Shaw testified regarding the steps employed to avoid contamination. Similarly, Mother has not provided any evidence regarding the role of an MRO or demonstrating that the screens performed by DCS did not comply with acceptable screening standards. Finally, as to her claim that foreign substances or an infected kidney could have triggered false positives for alcohol, Mother submitted no expert or scientific evidence proving this to be true or explaining the amount of these substances required to trigger a false positive. Mother also failed to submit any proof that she actually consumed an amount of these substances necessary to trigger a false positive. Mother has provided only her own testimony as proof that her positive drug screens were inaccurate. Notably, the juvenile court stated in its final order that it was "impossible for

- 17 -

[it] to accept [this] as credible testimony." Mother has not pointed to any evidence in the record demonstrating that the juvenile court's finding regarding her credibility was erroneous. Therefore, we will not disturb the juvenile court's factual determination that Mother tested positive for drugs and alcohol numerous times throughout these proceedings.

We recognize that Mother made some efforts to comply with the responsibilities outlined in the permanency plans. However, she has not complied with the most important responsibilities provided in the plans: to refrain from drug and alcohol use. Failure to comply with these responsibilities rendered her noncompliance with the permanency plan substantial. We would also note that Mother has failed to comply with additional important responsibilities listed in the permanency plans. She has admittedly not provided proof of employment and did not have stable housing at the time of trial. Further, Mother's drug and alcohol use presents a substantial risk of the children remaining dependent and neglected as it was the condition that resulted in the children being adjudicated dependent and neglected when the case began. Therefore, we affirm the juvenile court's ruling as to this ground for termination.

### 2. Persistent Conditions

Next, we address whether the juvenile court erred when it found that DCS proved the statutory ground of persistent conditions by clear and convincing evidence. The ground of persistent conditions exists where:

> (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:

> > (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> > (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> > (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. This Court has explained that "[t]he necessary order of removal is 'the threshold consideration' for this ground." *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015)).

The purpose behind the ground of persistent conditions "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008). Importantly, rather than focusing on the parent's efforts to remedy the conditions preventing reunification, "the ground of persistent conditions focuses on whether the parent's efforts have been fruitful, i.e., whether the parent has remedied the conditions that led to the child's removal or whether those conditions 'will be remedied at an early date . . . in the near future.'" *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *20 (Tenn. Ct. App. Sept. 14, 2012) (quoting Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii)). "This ground for termination focuses on the results of the parent's efforts at improvement rather than the mere fact that he or she has made them." *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *17 (Tenn. Ct. App. Nov. 6, 2020) (citing *In re Abigail F.K.*, 2012 WL 4038526, at *20).

Clearly, the six-month statutory time period has been met in this case. The order removing the children from Mother's custody was entered on November 12, 2019, in the context of a dependency and neglect proceeding. The first day of trial took place on September 23, 2024, more than four and one-half years later. The primary factor leading to the adjudication of these children as dependent and neglected and their removal from Mother's custody was Mother's drug use. Mother has made some attempts to become sober throughout these proceedings. She has participated in several programs and services intended to promote her sobriety and appears to have experienced some brief periods of sobriety, especially during the early stages of the case. However, none of these activities resulted in her remaining sober for the extended period of time necessary to remedy the conditions which led to the children being brought into DCS custody. Both in-home trial visits that took place in this case were disrupted because Mother tested positive for drugs. She has tested positive for drugs and/or alcohol more than 30 times since these proceedings began. Mother even tested positive for alcohol between the first day of trial and the second day of trial. Despite the immense amount of time that has passed since this case began, Mother has still not remedied the primary condition which resulted in the children being removed from her custody. Likewise, there is no evidence demonstrating that she will be able to do so in the future, let alone in the near future. Additionally, the testimony submitted at trial indicates that Mother's continued involvement in the children's lives would stand as an obstacle preventing them from finding suitable long-term placements. Mother's behavior during this case has led to the disruption of at least one foster placement.

- 19 -

Additionally, Kamden's current foster parents informed Ms. Shaw that they would consider adopting him after observing his progress once he was no longer in contact with Mother. Testimony indicated that the children are becoming more adversely affected by Mother's behavior as they grow older and are at a stage in which they require "permanency." Mother's continued presence in their lives would obstruct this goal. Accordingly, we affirm the juvenile court's determination that DCS proved the ground of persistent conditions by clear and convincing evidence.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody of the Children

The juvenile court determined that DCS proved the ground of failure to manifest an ability and willingness to assume custody of the children by clear and convincing evidence. This ground exists where a parent:

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). To prove this ground, the petitioner must prove two "prongs" by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d at 674. The first prong is that "the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[.]" *Id.* This is satisfied by "clear and convincing proof that a parent . . . has failed to manifest <u>either</u> ability or willingness[.]" *Id.* at 677. "A parent's ability to assume custody or financial responsibility is evaluated based 'on the parent's lifestyle and circumstances.'" *In re Trenton B.*, No. M2022-00422-COA-R3-PT, 2023 WL 569385, at *6 (Tenn. Ct. App. Jan. 27, 2023) (quoting *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614 at *5 (Tenn. Ct. App. Apr. 9, 2020)). "When evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). The second prong requires proof that "placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

Mother's drug and alcohol use clearly demonstrates the lack of an ability to care for the children. *See In re Riley B.*, No. E2022-00684-COA-R3-PT, 2023 WL 3477216, at *4 (Tenn. Ct. App. May 16, 2023) (finding that a mother's long history of drug abuse which was not fully resolved at the time of trial constituted clear and convincing evidence "that she failed to manifest an ability to assume custody of the children"). Mother's substance abuse has persisted as one of the major obstacles to reunification throughout these proceedings as it prevents Mother from effectively parenting the children. Drug use led to the filing of the dependency and neglect proceedings and caused both trial home visits in

- 20 -

this case to be disrupted. Despite having five years to do so, Mother has failed to achieve sobriety. While Mother appears to have made some effort to become sober, she tested positive for drugs and/or alcohol more than 30 times over the course of the proceedings.

Additionally, Mother has failed to acquire and maintain stable housing and is clearly unable to provide for the children financially. Mother is presently living "predominantly" with an uncle and cousin. She often sleeps in her car or hotel rooms. Mother was offered both housing resources and assistance by DCS throughout the case. However, she either refused the help offered or failed to take advantage of those resources. Further, at the time of trial, Mother was earning between $500 and $600 per week. Mother had not paid for housing for several years but still had no money saved. Mother pointed to her car payment, car repairs, and storage costs in addition to her child support as the costs preventing her from saving money. Notably, the juvenile court had already reduced the amount of child support being paid toward Kamden and Keigan's expenses and waived all arrearages. When asked about how she intended to care for the children financially, Mother responded, "[w]ell, my child support would stop whenever they come home." As the juvenile court noted, if the children were returned to Mothers custody, she would then be responsible for paying for those costs directly instead of paying them in the form of child support. Clearly, Mother has not demonstrated that she has the ability to care for the children financially.

Mother has failed to manifest an ability to assume custody through her continued drug use. She has also failed to manifest an ability to assume financial responsibility for the children. Additionally, Mother's history of drug use and inability to maintain a home and financial security indicate a sufficiently probable risk of substantial harm to the children's physical and psychological welfare. Therefore, the juvenile court did not err when it determined that Mother failed to manifest an ability and willingness to assume custody or financial responsibility.

## B. Best Interests of the Children

Having determined that the juvenile court did not err when it found DCS proved three statutory grounds for termination existed, we now consider whether the termination of Mother's parental rights was in the best interests of the children. The factors to be considered are set out in Tennessee Code Annotated section 36-1-113(i), which states:

(i)(1) In determining whether termination of parental . . . rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

- 21 -

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of

- 22 -

the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). Many of these factors are interrelated. Therefore, we address several of them in concert.

First, we consider those interrelated factors concerning the children's need for stability and continuity of placement, the effect the potential change of caretakers and physical environment would have on the children, and their parental attachments and emotionally significant relationships with persons other than parents and caregivers. Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), (H), and (I). While Kamden has proceeded through multiple placements since coming into DCS custody, he appears to finally be in a placement providing an opportunity for permanency. He has been placed in the home since June 2022, and the foster parents were considering adoption at the time of trial. Unfortunately, Keigan has not achieved any stability throughout these proceedings. He

- 23 -

has disrupted several foster placements through aggressive behavior and has spent much of his time at residential facilities. The testimony indicated that many of Keigan's struggles stem from his relationship with Mother. Keigan clearly loves Mother, but he has experienced very negative reactions due to Mother's inability to remain sober and her failure to assume custody. While Keigan has not yet formed any relationships with others, there is no evidence demonstrating that his continued relationship with Mother will become stable. The evidence indicates that a continued relationship between him and Mother would likely hinder the formation of any stable relationships. Additionally, both children have special psychological, medical, and educational needs. If placed with Mother, it is unlikely that she would be able to properly care for these needs. Therefore, factors (A), (B), (H), and (I) weigh in favor of termination as to both Keigan and Kamden.

Next, we consider the interrelated factors concerning the children's interests in stable and secure housing and parenting. Tenn. Code Ann. § 36-1-113(i)(1)(C), (D), (E), (F), (G), and (O). Mother has not demonstrated any constancy in meeting the needs of either child. She has continued to use drugs and alcohol throughout the proceedings and has not maintained stable employment or housing. Mother does share parental bonds with the children, but in no way can those bonds be considered healthy. Kamden becomes very anxious and agitated in anticipation of Mother's visits, and then heavily regresses for days after the visits are over. Additionally, the testimony demonstrated that the children's continued relationship with Mother has heavily contributed to their inability to cultivate healthy relationships with others and has contributed to the disruption of at least one foster placement. There is no indication that Mother will cultivate a healthy relationship with either child soon, as her continued substance abuse continues to stand as a barrier to her ability to do so. These proceedings have gone on for approximately five years, and it appears that no progress has been made in cultivating healthy relationships between Mother and the children. Thus, we find that factors (C), (D), and (O) weigh in favor of termination. However, Mother has maintained consistent visitation with the children throughout these proceedings. She even maintained regular visitation with Keigan while he was placed at residential facilities in Georgia. Thus, factor (E) weighs against termination. We also note that additional factors exist pertaining to the children's interests in a stable home. Tenn. Code Ann. § 36-1-113(i)(1)(F)-(G). However, these factors are neutral in this case. Ms. Shaw testified that the children were not fearful of Mother at the time of trial, despite the allegations of physical abuse made over the course of the proceedings. Additionally, while it appears that the children were exposed to domestic violence, no evidence was submitted regarding the existence of any residual trauma or indicating Mother's presence triggered traumatic responses.

Factors (L) and (K) both concern the reasonable efforts of DCS to assist the parent and the parent's inclination to engage in DCS offered services. DCS made reasonable efforts to assist Mother throughout this case. Ms. Shaw testified that DCS offered services intended to aid Mother in achieving sobriety. Further, Ms. Shaw stated that she provided Mother with a list of housing resources. Ms. Sanders testified that her team attempted to

locate Mother housing when she was forced to leave her apartment. Ms. Sanders also stated that she attempted to have Mother placed in the "Healing Hearts" program, which would have permitted her to live in a facility rent free and allowed her to save money while working toward regaining custody of the children. Mother completed several IOPs, participated in a drug and alcohol assessment, and completed two parenting classes. However, she clearly did not employ the IOP resources properly as she has failed to remain sober. Further, it appears that she used none of the housing resources she was provided. Thus, factors (L) and (K) both weigh in favor of termination.

Factor (N) considers whether the parent or a person residing with the parent has ever exhibited brutality, physical, sexual, emotional, or psychological abuse toward others. Mother has been accused of physical abuse against her children several times throughout this case. The initial dependency and neglect petition alleged that Mother had physically and psychologically abused her daughter. Further, Keigan has made statements indicating Mother has physically abused him multiple times. One such allegation indicated that Mother used a fork to scratch Keigan on his back. Therefore, this factor also weighs in favor of termination.

Regarding factor (S), it appears that Mother did make consistent child support payments throughout the majority of the proceedings. At one point, petitions for contempt were filed against Mother for failure to pay support. However, the juvenile court appears to have determined that good cause for Mother's failure to pay existed, as it reduced Mother's monthly support payments, waived all arrearages, and dismissed the pending contempt actions. There is no evidence that Mother has failed to pay her support obligations since that time. Thus, factor (S) weighs against termination.

Finally, we consider the interrelated factors concerning the parent's adjustment of circumstances detrimental to the environment, health, and psychoses of the children. Tenn. Code Ann. § 36-1-113(i)(1)(J), (M), (P), (Q), (R) and (T). Mother has not adjusted or addressed the circumstances preventing her from caring for Keigan and Kamden. The children were initially removed from her custody due to drug exposure. Since that time, Mother has tested positive for drugs and/or alcohol more than 30 times. Two trial home visits were disrupted due to Mother's drug use. Despite having five years to do so, Mother has made zero progress toward obtaining long-lasting sobriety. Mother has also failed to demonstrate an ability to provide a home or financially for the children. She has neither rented nor owned a dwelling since 2022. She presently stays with relatives, in hotel rooms, or in her car. Nothing indicates that this will end soon. Additionally, Mother testified to earning between $500-$600 per week. When asked how she would afford to care for the children if they were placed back in her care, she stated only that she would no longer have to make child support payments. Finally, concerning Mother's emotional maturity, the juvenile court determined that "Mother ha[d] not been mentally or emotionally able to provide a safe and stable home or she would have done so by now." We agree. Therefore, factors (J), (M), (P), (Q), (R), and (T) each weigh in favor of termination.

Having reviewed the best interest factors, we agree that the facts, viewed as a whole, amount to clear and convincing evidence that it is in the best interests of both Keigan and Kamden for Mother's parental rights to be terminated. Therefore, we conclude that the juvenile court did not err when it determined termination was in the best interests of the children.

## V.    CONCLUSION

For the foregoing reasons, we affirm the decision of the juvenile court. Costs of this appeal are taxed to the appellant, Leah S., for which execution may issue if necessary.


_____
CARMA DENNIS MCGEE, JUDGE